**PNC BANK, NATIONAL ASSO-CIATION, Plaintiff and Counter-defendant,**

v.

**GOYETTE MECHANICAL COMPANY, INC., Goyette–West, Inc., Dominic Goyette, and Dominic T. Goyette Trust Dated August 26, 1998, as Amended, Defendants, Cross-plaintiffs, and Cross-defendants,**

and

**El Mechanical, Inc., Defendant, counter-plaintiff, Cross-plaintiff, and Cross-defendant,**

and

**Goyette Mechanical Company, Inc., Goyette–West, Inc., Dominic Goyette, and Dominic T. Goyette Trust Dated August 26, 1998, as Amended, Third-party plaintiffs,**

v.

**Gerald Peguese, PS Design Systems, LLC, Isaiah Stovall, and Carla Jackson–Stovall, Third-party defendants.**

Case No. 14–10527.

United States District Court,
E.D. Michigan,
Southern Division.

Signed April 25, 2014.

Matthew J. Boettcher, Patrick C. Lannen, Plunkett & Cooney, Bloomfield Hills, MI, for Plaintiff and Counter-defendant.

Alan D. Penskar, Harris, Goyette, Paul J. Goyette, Law Offices of Harris, Goyette & Winterfield, P.C., Flint, MI, Latoya N. McBean, Mark W. Peyser, Howard and Howard, Royal Oak, MI, Chris M. Parfitt, Timothy P. Dugan, Deneweth, Dugan, Troy, MI, for Defendants, Cross-plaintiffs, and Cross-defendants.

Alan D. Penskar, Harris, Goyette, Paul J. Goyette, Law Offices of Harris, Goyette & Winterfield, P.C., Flint, MI, Latoya N. McBean, Mark W. Peyser, Howard and Howard, Royal Oak, MI, for Third-party plaintiffs.

James W. McGinnis, Detroit, MI, for Third-party defendants.

### OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR RECEIVER, DENYING GOYETTE DEFENDANTS' MOTION FOR CONTEMPT, AND VACATING INJUNCTION

DAVID M. LAWSON, District Judge.

Plaintiff PNC Bank extended a $6 million line of credit and a $451,107 term loan to defendants E.L. Mechanical, Inc., Goy-

ette Mechanical Company, Inc., and Goyette–West, Inc. as joint borrowers. In its complaint, PNC Bank alleges that the defendants defaulted on the loan agreement by failing to maintain the required minimum tangible net worth and debt to earnings before interest, taxes, depreciation, and amortization (EBITDA) ratio. On January 28, 2014, the plaintiff demanded full payment of the indebtedness totaling $5,636,434.02. Since demanding full payment under the loan agreements, the plaintiff alleges that E.L. Mechanical (ELM) diverted and refused to turn over payments received from accounts. PNC Bank moved for the appointment of a receiver.

The Court held a hearing on February 14, 2014, at which the parties explained that they each were engaged in construction work involving the mechanical trades. The Goyette defendants provided support services to ELM on jobs ELM obtained. The Goyette defendants became suspicious, however, when ELM departed from conventional practice and started making payments directly to suppliers and subcontractors, instead of remitting gross proceeds to Goyette, who would pay trade creditors and deposit certain amounts into a cash collateral account, per the joint loan agreement.

The Court declined at that time to appoint a receiver, and instead issued a preliminary injunction that was intended to restore the relationship of the defendants to *status quo ante*. The preliminary injunction required ELM and the Goyette defendants to abide by the terms and conditions of the cash collateral agreement; required ELM to deposit all funds that it has received since December 1, 2013 into the PNC cash collateral account; required the Goyette defendants to deposit all funds into the PNC cash collateral account; required ELM and the Goyette defendants to provide a full account of their financial records; and required the parties to confirm existing outstanding receivables. The purpose of these orders was to put the defendants' relationship back on track, allow both businesses to operate successfully, permit ELM to complete its projects and collect revenue, and make the Bank secure. The experiment failed.

The Goyette defendants note that they managed all stages of ELM's accounting and administrative processes before the dispute arose, including collecting all customer payments and accounts receivable, managing cash flow, paying all subcontractors and suppliers, and paying loan obligations under the joint PNC line of credit. Despite the injunction, Goyette says that the parties have not returned to status quo nor are they in the position they were in before the dispute arose. Goyette says that they have fully complied with the Court's order and have solicited ELM's cooperation, but ELM has resisted Goyette Mechanical's attempts to restore its administrative and accounting role. They also say that ELM has violated the Court's order by continuing to write checks and pay expenses after the Court entered the order rather than deposit such funds in the PNC Cash Collateral Account; paying $300,000 on February 14, 2014, the day the Court entered the preliminary injunction, to PS Designs; misappropriating profits earned from its partnership with Goyette Mechanical; failing to provide a complete accounting with supporting documentation; and refusing to deposit into the PNC Cash Collateral Account all amounts received.

The Goyette defendants contend that there is approximately $ 850,000 in the Cash Collateral Account; another $2,400,000 yet to be collected on 28 jobs, 27 of which are complete; and $500,000 or more that should be collected from Chrysler from "impact claims" or errors and

omissions claims from the Federated Insurance Company. From that total of $3,750,000, the Goyette defendants contend that ELM will be required to pay out approximately $800,000 to subcontractors, suppliers, and field laborers as follows: $600,000 for the Chrysler JNAP job; $200,000 to various subcontractors and suppliers; and an additional $100,000 for anticipated ELM overhead expenses to collect the remaining receivables.

For its part, ELM admits that Goyette Mechanical previously managed most of their accounting and administrative process, grousing about the amount of the service fee. And it admits that the parties have not returned to the status quo, but says the reason is that Goyette Mechanical has put ELM out of business by using the authority of the injunction to cut off all funding for ELM's payroll and refusing to approve funding of the remaining work on the Chrysler Jefferson North Assembly Plant ("JNAP") project unless ELM agreed to disburse $650,000 dollars to PNC Bank. ELM says that such a disbursement would have to be paid from $606,900 received from Chrysler, which was designated by Chrysler for work to complete the JNAP project. ELM says that any checks written by ELM before and after the Court's February 14, 2014 order have been provided to Goyette and represent legitimate business expenses, including payroll, fringe benefits, monthly security system for the office, attorney fees, insurance premiums, and federal tax obligations. As for the $300,000 payment to PS Design, ELM says that it has provided Goyette Mechanical with invoices and has informed them that relevant design drawings are available for review.

ELM says that it has provided accounting and documentation that Goyette Mechanical required to the extent possible. It also says that it deposited $606,900 received from Chrysler. ELM has no objection to paying down the Line of Credit, but to do so with prepaid funds from Chrysler is an unreasonable request and will result in Chrysler asserting that ELM has breached the contract. ELM says that Goyette's refusal to fund ELM's payroll and to fund the remaining JNAP work has put ELM at risk with regard to its JNAP contract with Chrysler and collecting any remaining receivables from Chrysler. ELM says that it has laid off its entire workforce and is out of business. It's president, Gerald Peguese, and Tony Miarka, who assists with management, are not being paid because of Goyette's continual demand that the release of any payroll is contingent upon JNAP funds being paid to PNC Bank.

ELM says that collection of the non-Chrysler receivables (about $1.92 million) has been complicated by the demand letters from PNC Bank, certain customers have inquired whether ELM has the ability to perform warranty work, and Goyette Mechanical has been defaming ELM to customers and suppliers. ELM says the collection of any amount for "claims" is currently at risk since it is out of business and unable to perform due to Goyette's failure to approve funding. ELM says that Goyette has not approved any payroll requests by ELM and therefore it cannot perform any work.

ELM acknowledges that a receiver may be "necessary at this point" because ELM no longer can operate as a result of Goyette's actions and has essentially had no control over its operations for quite some time due to Goyette's micro-managing and interference.

PNC Bank adds that it took control of Goyette's and ELM's initial deposits after the injunction was entered. However, since then, any appearance of cooperative effort has been lost. PNC Bank says that,

apart from the parties agreeing to pay small bills for a photo copier and telephone service, nothing has changed and the working relationship between Goyette and ELM remains dysfunctional and the situation has worsened. PNC Bank observes that Goyette and ELM have filed new cross and third-party claims against each other, new parties have been added and sued, and Goyette filed its emergency motion for a receiver based on numerous allegations of ELM's wrongdoings.

PNC Bank notes that, while Goyette and ELM continue to trade volleys, their joint business operations appear to have ground to a halt, the Bank has not been paid, and its collateral position today is far worse that it was on February 14, 2014 when the injunction was entered. PNC Bank believes that the situation is intolerable and that a receiver is necessary to protect the Bank's undisputed interests and to bring order to the chaos that has existed over the last eight weeks.

Rule 66 of the Federal Rules of Civil Procedure authorizes the appointment of a receiver if a person with an interest in the property provides sufficient justification. Fed.R.Civ.P. 66; *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241 (5th Cir.1997). The "district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court." *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir.2006). "[T]he form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion." *Santibanez*, 105 F.3d at 241 (quoting 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (1973)).

■ District courts have considered a number of factors when determining whether to exercise their discretion to appoint a receiver, including (1) the adequacy of the security; (2) the financial position of the borrower; (3) any fraudulent conduct on the defendant's part; (4) imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (5) inadequacy of legal remedies; (6) the probability that harm to the plaintiff by denial of appointment would outweigh injury to parties opposing appointment; (7) the plaintiff's probable success in the action and the possibility of irreparable injury to the plaintiff's interest in the property; and (8) whether the plaintiff's interests sought to be protected will in fact be well-served by a receivership. *Fed. Nat. Mortgage Ass'n v. Mapletree Investors Ltd. P'ship*, 10–CV–10381, 2010 WL 1753112, at *3 (E.D.Mich. Apr. 30, 2010) (citations omitted). Moreover, the parties' advance consent to the appointment of a receive is a strong factor weighing in favor of appointing one.

■ The balance of the factors weigh in favor of a receiver.

*First*, the plaintiff's likelihood of success on the merits favors the appointment of a receiver. PNC Bank alleges that it advanced a $6 million line of credit made jointly to defendants El Mechanical, Inc., Goyette Mechanical Company, Inc., and Goyette–West Inc., and none of the parties dispute that they are in default under the loan documents and guaranties.

■ *Second*, the borrowers' questionable financial position favors the appointment of a receiver. Courts have found "the adequacy of the security and the financial position of the borrower to be the most important" factors in evaluating whether to appoint a receiver. *Fed. Nat. Mortgage Ass'n v. Mapletree Investors Ltd. P'ship*, 10–CV–10381, 2010 WL 1753112, at *3 (E.D.Mich. Apr. 30, 2010) (citing *New York Life. Ins. Co. v. Watt West Inv. Corp.*, 755 F.Supp. 287, 292

(E.D.Cal.1991)). The borrowers' financial position has deteriorated since the Court entered its preliminary injunction. PNC Bank indicates that the borrowers had access to the full $6 million line of credit on February 14, 2014, the day the injunction was entered, and $5,315,162.89 was then outstanding. However, PNC Bank says that as of April 3, 2014, the value of the borrowers assets—the collateral for the line of credit—had shrunk to $4,537,757.85. The amount that the borrowers owed had also increased to $5,658,390.64. PNC anticipates the borrowers' financial position to continue to deteriorate.

*Third,* it is apparent that less intrusive remedies have failed. "The appointment of a receiver may be appropriate when other approaches have failed to bring about compliance with the court's order." *Band v. Livonia Associates,* 176 Mich.App. 95, 105, 439 N.W.2d 285 (1989) (citing *Petitpren v. Taylor School Dist.,* 104 Mich. App. 283, 294, 304 N.W.2d 553 (1981)). The Court's February 20, 2014 preliminary injunction required ELM and the Goyette defendants to abide by the terms and conditions of the Cash Collateral Agreement. Under the Cash Collateral Agreement, ELM was required to deposit all accounts paid directly to ELM into the Cash Collateral Account and no funds could be transferred without approval from Goyette Mechanical and PNC Bank. ELM failed to deposit all of its funds into the Cash Collateral Account and therefore failed to comply with the Court's order. Were that the only problem, an order of contempt might be appropriate to coerce ELM into complying with the preliminary injunction. But since the Court entered that order, it has become clear that the purpose of the preliminary injunction is no longer desirable or achievable. The Court required the parties to abide by the Cash Collateral Agreement to encourage the parties to resolve their differences, to honor their contractual obligations, and to stabilize their businesses. The parties have not done so. Instead, it appears that the parties have used the Court's order as a means to harm each other's businesses.

Courts have appointed receivers when acrimony presents an imminent threat to the viability of the business. *See Saltz v. Saltz Bros.,* 84 F.2d 246, 248 (D.C.Cir. 1936) (affirming appointment of a receiver where officers of a corporation could not agree on the management of their business); *see also Moran v. Edson,* 493 F.2d 400, 407 (3d Cir.1974) ("a court of equity may appoint a receiver when there are such dissensions in the board of directors of a corporation or between two groups of its stockholders, each holding an equal number of shares, that it is impossible to carry on the business with advantage to the parties interested, even though the corporation is solvent.") (citing 16 Fletcher, Cyclopedia Corporations § 7713); *Central Holding Co. v. Bushman,* 238 Mich. 261, 271, 213 N.W. 120 (1927) (appointment of a receiver is appropriate if there is "proof of dissension among the directors making it impossible for the corporation to carry on its business."); *Vieth v. Ress,* 60 Neb. 52, 54, 82 N.W. 116, 117 (1900) (holding that a receiver for a partnership may be appointed in cases of insolvency, dissension, probability of waste, or when dissolution is necessary).

Here, the parties' deteriorating relationship has crippled ELM's business and exposed the Goyette defendants to default status with PNC Bank. ELM has made several requests for distributions to make payroll. Goyette refused to consent, causing ELM to lay off its entire workforce and to close its business. After ELM shut down, Gerald Peguese, the ELM's president, and Tony Miarka, who assists with management, asked Goyette to authorize payment for their salaries while they col-

lect any remaining receivables. But Goyette Mechanical refused to authorize payment unless Peguese would take a pay cut, stating that they thought he is significantly overpaid.

ELM also has made several requests to pay project obligations, but Goyette has refused to approve those payment requests and, in some instances, contacted subcontractors directly to accuse ELM of wrongdoing. Outside contractors have been caught in the middle of the dispute, and since the Court entered its order, ELM's expenses have gone unpaid. PNC Bank states that ELM and Goyette have agreed to pay only two invoices over the last eight weeks: one for telephone service and the other for copier rental. Those payments were made only after the service providers threatened to cut off service. Such strong-arm tactics are unlikely to benefit either party in the long-term. The parties are jointly liable for any debt, and if ELM remains shut down, it will be unable to complete its remaining projects, solicit new projects, or to collect revenue. A receiver is needed to protect not only PNC's interests, but ELM's and Goyette's as well. Neither business can operate effectively under the current circumstances.

*Fourth,* the plaintiff's interest in the property would be well-served by a receiver, who can take control of the defendants' businesses, complete projects, collect revenue, pay creditors, and then allow the parties to continue separately or wind up their affairs, as may be appropriate. "A receiver is an indifferent person between parties, appointed by the court to receive the rents, issue, or profits of land, or other thing in question, pending the suit, where it does not seem reasonable to the court that either party should do it." *Liberte Capital Grp., LLC v. Capwill,* 462 F.3d 543, 551 n. 2 (6th Cir.2006). Alternatively, the Court could use its contempt powers to

enforce the injunction, but that seems pointless and likely self-defeating. It no longer seems reasonable for ELM to deposit any receivables into the Cash Collateral Account, since release of those funds requires consent of the very parties that are at loggerheads. Moreover, because Goyette Mechanical and ELM are now in an adversarial relationship, it is inappropriate for Goyette Mechanical to review and approve ELM's day-to-day businesses expenses. Nor does it seem wise for ELM to manage its own accounting. Not only does ELM lack the apparent capacity to do so (Goyette previously provided accounting services), but the plaintiff has made serious allegations that ELM diverted millions of dollars of account receivables that should have been deposited into the Cash Collateral Account.

The receiver's role will be to (1) safeguard the disputed assets, (2) administer the property as suitable, and (3) assist the district court in achieving a final, equitable distribution of the assets if necessary. *Liberte Capital Grp., LLC v. Capwill,* 462 F.3d 543, 552 (6th Cir.2006) (citing 13 *Moore's Federal Practice* ¶¶ 66.02, 66.03 (3d ed.1999)). A receiver will help safeguard PNC's interest in ELM's and Goyette's collateral, may help stabilize the defendants' businesses and, as a neutral party, will prevent the defendants from using the Cash Collateral Account documentation as a fishing expedition for litigation. Moreover, a receiver could help resolve conflicts that the Court should not resolve because (1) they are not primarily legal questions and (2) because the Court lacks the capacity to resolve the parties' day-to-day management disputes.

*Fifth,* it appears that all parties now agree that the appointment of a receiver is appropriate (albeit for different reasons). For the reasons noted here, the Court concurs.

Accordingly, it is **ORDERED** the PNC Bank's motion to appoint a receiver [dkt. # 3] is **GRANTED.**

It is further **ORDERED** that Russell Long of O'Keefe Associates Consulting, LLC will be appointed as receiver to serve with bond, to be governed by the appointment order entered separately.

It is further **ORDERED** that the Goyette defendants' motion for contempt [dkt. # 42] is **DENIED.**

It is further **ORDERED** that the preliminary injunctive order [dkt. # 23] is **VACATED.**

It is further **ORDERED** that the parties shall appear for a status conference to discuss case management dates on **Wednesday, May 14, 2014 at 4:30 p.m.**